**LAPEER OAKDALE PARENTS ASSOCIATION FOR RETARDED CITIZENS (LOPARC), a Michigan non-profit association, et al., Plaintiffs,**

v.

**Frank M. OCHBERG, M.C., Individually and in his official capacity as Director of the Michigan Department of Mental Health, et al., Defendants.**

No. 80–40059.

United States District Court, E. D. Michigan, S. D.

July 17, 1980.

Richard G. Stehno, Gregory Gibbs, Flint, Mich., for plaintiff.

Thomas Wheeker, James M. Batzer, Asst. Attys. Gen., Lansing, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

### NEWBLATT, District Judge.

As stated by Plaintiff, "On April 4, 1980, Plaintiff filed this action against the Defendants for the purpose of securing injunctive relief requiring the officials of the Department of Mental Health and the Department of Social Services to insure that residents and recipients of Oakdale are provided with their federal and state constitutional and statutory guarantees to protection from harm, right to treatment and right to habilitation. Since April 21, 1980 expedited discovery has been held on the issues of staff lay-offs at Oakdale and transfer of residents from Oakdale."[1]

The matter is currently before the Court for decision on Plaintiff's motion for a preliminary injunction restraining Defendants from laying off or terminating employees at Oakdale, an intermediate care facility of the State of Michigan for the mentally retarded. The evidentiary record upon which this issue is submitted consisted of depositions in lieu of live testimony.[2] It consists of the deposition testimony of:

*David Ethridge*—Oakdale Director.

*Michael Lynch*—Child Welfare licensing consultant, employed by the State of Michigan.

*James J. Coleman*—Director of Normalization and Treatment at Oakdale.

*Sharon K. Hazel*—a registered nurse employed at Oakdale.

*Robert Kopascz*—an activity training aid at Oakdale and President of Local 567 of American Federation of State, County and municipal employees.

*Karen E. Hues*—an employee of the Michigan Protection and Advocacy Service for Developmentally Disabled citizens.

*Vernon A. Stehman*—Chief Deputy Director, Michigan Department of Mental Health.[3]

*Robert Clinton*—resident care supervisor at Oakdale.

It is the essential thrust of Plaintiffs' present motion that the lay-offs of employees contemplated by the facility will result in denying to the facility's residents their statutory and constitutional rights to be free of harm, for treatment and habilitation. That such rights exist is not contest-

---

**1.** Page 1, Plaintiffs' memorandum in support of Injunctive Relief prior to class certification.

**2.** These depositions were obtained at great expense by counsel in an effort to aid the Court in creating the necessary record in view of the previously scheduled matters which had priori-ty. For their concern for the Court and the urgency of their clients' interests, the Court expresses its appreciation.

**3.** A large volume of exhibits accompanied the depositions.

ed at this hearing,[4] and indeed these rights do not appear contested in any manner.

Plaintiffs have shown that there is a serious question, probably to be resolved in Plaintiffs' favor, as to whether the staffing ratios in existence at Oakdale meet the requirements of the applicable regulations of the Department of Health Education and Welfare.[5] Plaintiffs claim that the ratios now in existence deprive the residents of Oakdale of their rights.

What is most difficult about this case is that Oakdale has been and still is involved in a physical renovation or reconstruction program which results in some changes in use and operation. What is more important however, is that Oakdale is in the process of reducing its resident population allegedly in compliance with the provisions of The Developmentally Disabled Assistance Bill of Rights Act[6] which provides:

"The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and *should be provided in the* setting that is least restrictive of the person's personal liberty."  42 U.S.C. § 6010(2).

It is also unquestioned that the resident population of Oakdale within the last several years has been reduced from a number in excess of 1,300 to a number of approximately 866.  Such a resident reduction may well justify staff reductions and there is nothing in this record which establishes the relationship of such resident population reduction to staff reduction.  The resident population, however, is contemplated to be reduced further through both transfers to other institutions and community placement.[7]

So Plaintiffs direct their attention to relief from impending lay-offs of direct care staff in the context of ongoing renovation of physical facilities and reduction in resident population.  However, the facility and the Department of Mental Health have not as yet resolved precisely what they intend to do in this context.  The record is replete with the uncertainty as to the future course.

Two decisions appear to have been made[8] to close the acute-care facility (hospital) at the institution and have acute care rendered by the Lapeer General Hospital and to close the Behavior Training Unit (BTU). Neither of these have come to pass and neither has the impact or care, treatment and habilitation been determined.  (Indeed, these decisions may have been rescinded).

■ Plaintiffs persistently urge that the changes at Oakdale are as a result of mandated budget cuts which, if given effect, will result in deprivation of residents' rights.  Defendants, on the other hand, urge that the changes are due to a restructuring of the facility necessitated by the applicable statutes.  What is clear in this morass if nothing else, is that in part, both purposes play a role.  *It is also clear that budget cuts cannot under any circumstances justify depriving the residents of their rights.*  This institution as well as all governmental operations should be constantly re-evaluated in all aspects not only to afford the residents that to which they are entitled, but also to assure the cost effectiveness of such operations.  It is apparent both must be considered, and it cannot be said on this record that the Defendants have not taken into account both.

According to the evidence presented, each resident is to have a care, treatment and habilitation plan established thirty (30) days after arrival.  This plan is to be put forth by an interdisciplinary team.  The plan is contemplated to provide to individual resi-

---

4.  Note the absence of any such contest in Defendants' brief in Opposition to Motion for Preliminary Injunction.

5.  42 CFR 190, 45246.  The Department is now known as the Department of Health and Human Services (HHS).

6.  42 U.S.C. § 6001–6081.

7.  Part of the relief Plaintiffs originally sought but withdrew as a subject for preliminary injunctive relief, was an order enjoining community placement.

8.  Although on this record, the court is not certain that these decisions have been made.

dents that to which they are statutorily and constitutionally entitled. In order to show a deprivation or rights, Plaintiffs would have to show either (1) that the plan for a resident was not appropriate for the residents' condition; or, (2) that an appropriate plan was not being implemented. Apparently Plaintiffs are trying to establish the second type of case—i. e., the plan for the individual resident is not being implemented due to insufficient staffing and thus the resident is deprived of rights. While there is considerable controversy as to the staffing ratios and the interpretation and meaning of the regulations, there is no *direct* evidence that the residents are not afforded their rights. Here it must be pointed out that at some point, a deficiency in staffing ratios may well establish impossibility of affording residents their rights. That point has simply not been met here. There is neither direct evidence nor expert testimony from circumstantial evidence from which it can be concluded that residents' rights are violated.

While it may be plausibly argued that not meeting the staffing ratios violates the federal standards, the institution's certification as an ICF/MR has not been revoked. As a matter of fact, the appropriate authorities are evaluating the institution's response to the report of non-compliance. In addition, Dr. Ethridge testified that upon any reduction in force the staffing ratios will be met. The final lay-off decisions have not been made and hence, it is not possible to determine that residents' rights will be violated by the reduction in direct care staff. It may well be that rights violations can be established upon trial of this matter or upon further application with additional evidence. And of course, the Court retains jurisdiction over this matter for further consideration. Simply put, staffing ratios as prescribed by the applicable regulations may justify withdrawal of approval or certification of the institution as an Intermediate Care Facility for the Mentally Retarded, but does not, without more establish rights violations.

■ It is necessary to point out that the Court's suspicions as to the existence of rights violations are not substitutes for evidence. Whether one relies upon *Mason County Medical Association v. Knebel*, 563 F.2d 256 (6th CA, 1977) as do the Defendants, as setting the standards or requirements before a preliminary injunction is issued, or upon *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86 (9th CA, 1975), as argued by the Plaintiffs, this Court concludes that Plaintiffs have shown (1) only a possibility of success rather than the likelihood. Further, no irreparable injury has been established. In addition, until such time as the Defendants have determined which employees in which category or job classification will be laid off and the resulting staffing ratio, it is impossible to determine that the staffing is inadequate to provide residents their rights. And finally, it is found that the public interest would not be served at this time by granting the relief requested. Particularly is this true in the state of agitation and change under which Oakdale exists at this time of renovation and population reduction.

Because the Court is fearful that residents' rights may be or have been violated or that proof of such violations in addition to that currently presented may be available, but not yet presented, the Court calls to the attention of counsel that it stands ready to protect the residents from a violation of their rights at any time proof warrants such protection. And to that end, the Court directs Defendants to provide Plaintiffs' counsel, with a copy to the Court, building by building, unit by unit, population reports weekly together with direct care staffing for each shift in each unit. The report shall not include supervisors of direct care staff, but shall include only those who provide direct care without supervisory functions. In addition, should there be any final decision made as to the closing of any building or unit or lay-offs of direct care staff, the decision shall be communicated directly and forthwith to Plaintiffs' counsel with a copy to the Court.

One of the problems presented in an application for temporary relief prior to a full hearing on the merits is the amount of time available for preparation and presentation. In addition, difficulties were enhanced by the Court's schedule, which, because of the requirements of the Speedy Trial Act to dispose of criminal cases, resulted in the Court being unable to provide prompt hearing dates for live testimony. Sincere counsel aided the Court by making their presentations by depositions taken over a period of time in different locations. The Court's gratitude is herein acknowledged. And the Court looks forward to the presentations made hereafter without the time pressures attendant on this preliminary decision.

The application for a temporary injunction is denied at this time.

IT IS SO ORDERED.